**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-4970**

UNITED STATES OF AMERICA,

                    Plaintiff – Appellee,

          v.

RANDOLPH R. BAKER,

                    Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.   Henry E. Hudson, District Judge.  (3:10-cr-00328-HEH-1)

Submitted:  May 17, 2012            Decided:  August 23, 2012

Before AGEE, DAVIS, and DIAZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Charles D. Lewis, Richmond, Virginia, for Appellant.   Neil H. MacBride, United States Attorney, Alexandria, Virginia, Olivia L. Norman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Following a bench trial, the district court convicted Randolph Baker of conspiracy to distribute and possess with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(C). The court sentenced Baker to 156 months' imprisonment. On appeal, Baker argues that the evidence was insufficient to support his conviction and that the district court incorrectly calculated his sentencing range. Finding no merit to Baker's challenges, we affirm.

I.

A.

Because the district court returned a guilty verdict, we review the evidence in the light most favorable to the Government. See United States v. Burgos, 94 F.3d 849, 862-63 (4th Cir. 1996) (en banc).

From early June 2010 to early August 2010, Baker sold between 200 and 300 oxycodone pills to Natioe Alves on each of ten separate occasions. Alves routinely traveled from Boston to south Florida to buy pills from Baker and other sources, typically for $7 to $8 a pill, then re-sold them in Boston for up to $30 a pill. Alves recruited couriers to drive the oxycodone pills and money back and forth between Massachusetts and Florida. One of Alves's main couriers, Daniel Lennon,

2

testified that he transported between $45,000 and $86,000 of Alves's money to Florida on each of seven separate trips and accompanied Alves during most of the drug transactions with Baker. Alves typically traveled to Florida separately from Lennon, then used all of the money to buy oxycodone pills from Baker and other suppliers. Latoya Williams also testified that on several occasions she obtained "a lot" of pills from Baker, which she usually purchased through a third party and then re-sold to Alves. J.A. 347.

In early August 2010, a law enforcement officer stopped Lennon in Emporia, Virginia while Lennon was driving a vehicle rented in Alves's name. The officer seized 9000 oxycodone pills from Lennon. After further investigation, Drug Enforcement Administration agents executed a search warrant at Baker's home. Inside of Baker's house, the agents found a number of oxycodone pills, empty pill bottles, and two firearms. Inside of Baker's car, the agents found more oxycodone pills, pill bottles, prescriptions, and business cards for a pain clinic. An oxycodone addict, Brian Vogelpohl, approached Baker's house during the search and admitted to the agents that he was there to buy 100 oxycodone pills from Baker for $900. In exchange for immunity, the United States compelled Vogelpohl to testify at Baker's trial. In the aftermath of the drug scheme, Alves and Williams both pleaded guilty to charges of conspiracy to

distribute and possess with intent to distribute oxycodone. Lennon pleaded guilty to possession with the intent to distribute oxycodone.

## B.

On December 7, 2010, a grand jury returned an indictment charging Baker with conspiracy to distribute and possess with intent to distribute oxycodone. Baker waived his right to a jury trial, and on March 31, 2011 he pleaded guilty to the charges. On April 14, 2011, Baker filed a pro se motion to withdraw his guilty plea, which the district court granted. The court then set the case for a bench trial to commence on May 26, 2011, ultimately finding Baker guilty.

At Baker's sentencing hearing, the parties agreed that the total drug weight involved in Baker's offense was 158 grams of actual oxycodone, which is equivalent to 1058.6 kilograms of marijuana under the U.S. Sentencing Guidelines Manual § 2D1.1. Under the Guidelines, this qualifies as a level 32 offense. Baker received a two-level adjustment for the two firearms found inside of his home, for an adjusted offense level of 34, resulting in a Guidelines range of 151 to 188 months. The district court sentenced Baker to 156 months' imprisonment. Baker timely appealed.

4

## II.

We first consider Baker's challenge to the sufficiency of the evidence. We must sustain the district court's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." Burgos, 94 F.3d at 862 (internal quotations omitted).

Baker argues that the evidence was insufficient to sustain his conviction for conspiracy to possess with intent to distribute oxycodone. He claims that the Government failed to establish the existence of an agreement between the co-defendants and him, and that the limited number of transactions demonstrated no more than a mere buyer-seller relationship. We disagree.

To prove a conspiracy under 21 U.S.C. § 846, the Government must establish "(1) an agreement between two or more persons to engage in conduct that violates a federal drug law, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's knowing and voluntary participation in the conspiracy." United States v. Strickland, 245 F.3d 368, 384-85 (4th Cir. 2001). The underlying federal drug law at issue, 21 U.S.C. § 841(a)(1), states that "it shall be unlawful for any person knowingly or intentionally--(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

5

It is well-established that a defendant need not have knowledge of all of the details of the conspiracy. Strickland, 245 F.3d at 385. The existence of a conspiracy and the defendant's connection to it must be proved beyond a reasonable doubt, but "[o]nce a conspiracy has been proved, the evidence need only establish a slight connection between any given defendant and the conspiracy to support conviction." Id. at 385. The agreement "need only be a 'tacit or mutual understanding' between the defendant and his accomplice." United States v. Hackley, 662 F.3d 671, 679 (4th Cir. 2011) (quoting United States v. Ellis, 121 F.3d 908, 922 (4th Cir. 1997)). And "[c]ircumstantial evidence alone is sufficient to support a conviction for conspiracy." Id.

Although a buyer-seller relationship alone is not always enough to support a finding that a defendant was a conspirator under 21 U.S.C. § 846, "evidence of continuing relationships and repeated transactions" can support a finding of a conspiracy, "especially when coupled with substantial quantities of drugs." United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008). "Evidence of a 'buy-sell transaction . . . coupled with a substantial quantity of drugs' " can also " 'support a reasonable inference that the parties were co-conspirators.' " Id. (quoting United States v. Mills, 995 F.2d 480, 485 n.1 (4th Cir. 1993)).

In United States v. Hackley, we found sufficient evidence for the jury to conclude beyond a reasonable doubt that Hackley was part of a conspiracy on these facts: (1) Hackley's statement to a government informant that he was getting his supply of crack from his "family" in Maryland; (2) a government informant's testimony that Hackley was "still" getting cocaine, that he had known Hackley since 1992, and that they had discussed crack cocaine previously; and (3) a "cryptic conversation" between Hackley and one of his girlfriends in which Hackley referenced the "drug game."  662 F.3d at 680.

Here, as in Hackley, the evidence of "continuing relationships and repeated transactions," id. (internal quotations omitted), supports Baker's conspiracy conviction.  In fact, the evidence upon which Baker's conviction rests is far more persuasive than the minimum standard of sufficiency we established in Hackley.  During the summer of 2010, Baker regularly supplied oxycodone pills--usually hundreds at a time--to Alves.  Baker also sold to Williams on a less frequent basis, and he sold to Lennon on one occasion.  Alves and Baker were in close contact with each other throughout the summer--Alves's phone records showed ninety outgoing calls from Alves's phone to Baker's phone and twenty-two incoming calls from Baker's phone to Alves's phone between July 22, 2010 and August 6, 2010.  Lennon and Alves both testified that Baker knew Alves traveled

7

from Boston to Florida to purchase oxycodone pills and returned to Boston after buying them. As the evidence shows, Baker had extensive relationships with convicted members of a drug conspiracy and engaged in numerous drug transactions. The compelling evidence that proves Baker's conspiracy conviction far surpasses the evidence we held adequate to support Hackley's conviction.

Attempting to resist this conclusion, Baker claims that there was no " 'substantial quantity of drugs' " involved. Appellant's Br. 11. The trial record, however, belies this assertion, revealing that Baker sold to Alves somewhere between 200 and 300 pills on each of ten separate occasions from early June 2010 to early August 2010. This amount is far in excess of what an individual could use and proves that Baker did, in fact, sell a substantial amount of oxycodone.[*]

Although Baker may not have agreed explicitly to engage in a conspiracy, he had continuing relationships with convicted members of a drug conspiracy, engaged in repeated drug transactions, sold Alves quantities of oxycodone far beyond what

---

[*] Vogelpohl testified that he was addicted to oxycodone and took approximately three or four 30 mg pills a day, which equals approximately 120 pills per month. His testimony supports the conclusion that the amount sold by Baker to Alves--totaling roughly 2500 pills over a two-month period--far exceeds the amount that an individual could use.

could be used by an individual, and knew that Alves and Lennon routinely transported money and drugs between Florida and Massachusetts. Accordingly, we find that the evidence presented at trial supports Baker's conviction.

III.

We next turn to Baker's challenge to the district court's determination of the appropriate Guidelines range. The court's calculation of drug quantity for sentencing purposes is a factual finding that we review for clear error. United States v. Randall, 171 F.3d 195, 210 (4th Cir. 1999). The Government must prove the drug quantities attributable to the defendant by a preponderance of the evidence. Id.

Baker claims that the drug weight accepted by the district court was not supported by a preponderance of the evidence, and the court therefore erred in overruling his objections to the relevant conduct determination in the presentence report ("PSR"). We disagree.

To demonstrate clear error, Baker must make an affirmative showing that the facts in the PSR are incorrect. See Id. at 210-11. This he has not done. Baker claims generally that "[t]here is simply no evidence to support the statements made by the co-defendants," Appellant's Br. 12, but he fails to provide

any details, explanation, or case law to support his argument. Baker has thus failed to meet his burden on clear-error review.

Further, the district court's drug weight findings were made after careful deliberation, during which the court considered evidence presented at trial and stipulations made by the parties. The district court moreover used a conservative calculation of the drug weight to avoid over counting or double counting pills. For example, the court excluded the pills that Alves obtained from Baker when Lennon was not present, the quantity that Lennon obtained directly from Baker, and two empty pill bottles seized from Baker's home dated June 2010. The district court also counted only 400 of the oxycodone pills sold to Williams, despite Williams's unequivocal testimony that on one occasion she obtained as many as 1000 pills from Baker through a third party. And the district court did not include the pills that Baker supplied to Vogelpohl, who testified that he bought oxycodone pills from Baker for his own personal use "a few times a week" from approximately May 2010 until November 2010. J.A. 310.

Not only were the court's calculations precise and conservative, the court continued the sentencing for a month to afford the parties ample time to explore the appropriate drug weights. During the continuance, the parties produced a "Joint

Statement of Parties Regarding Drug Weight," on which the district court relied during Baker's sentencing hearing.

Accordingly, we find that the district court did not clearly err in overruling Baker's objection to the relevant conduct determination, and that the court correctly calculated Baker's sentencing range.

IV.

For the foregoing reasons, we affirm the judgment of the district court. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED